UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| STANLEY "DUKE" BENNETT, et al.,   )<br>)<br>       Plaintiffs          )<br>)<br>v.                                        )<br>)<br>ROARK CAPITAL GROUP, INC., et al.,   )<br>)<br>       Defendants      )  | Civil No. 09-421-P-S |

### RECOMMENDED DECISION ON DEFENDANTS' MOTION TO DISMISS

The defendants, Roark Capital Group, Inc., Roark Capital Partners, LP, Roark Capital Partners Parallel, LP, and RC Wood Structures Holding Corp., move to dismiss all five counts of the plaintiffs' second amended complaint in this case arising out of the closing in 2009 of manufacturing plants in Biddeford and Saco, Maine. Defendants' Motion to Dismiss the Second Amended Complaint ("Motion") (Docket No. 27) at 1. The motion does not specify the rule under which it is brought, but it appears to rest on a failure to state a claim upon which relief may be granted, which is a ground for dismissal established by Fed. R. Civ. P. 12 (b)(6). Oral argument on the motion was held before me on April 29, 2010.

### I. Applicable Legal Standard

As the Supreme Court has clarified:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted).

1

"In ruling on a motion to dismiss [under Rule 12(b)(6)], a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiffs." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). Ordinarily, in weighing a Rule 12(b)(6) motion, "a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Id*. "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* (citation and internal quotation marks omitted).

## II. Factual Background

The second amended complaint includes the following relevant factual allegations.

The individual plaintiffs, Stanley "Duke" Bennett, Richard Howard, Susan Welch, Aaron Vance, and Warren de Wildt, are former employees of Wood Structures, Inc., a wholly-owned subsidiary of one of the defendants. Second Amended Complaint ("Complaint") (Docket No. 26) ¶ 1. Plaintiff United Brotherhood of Carpenters and Joiners of America, Local 1996, was the collective bargaining representative of non-exempt hourly employees of Wood Structures, Inc., including Vance. *Id*. ¶ 10.

Defendant Roark Capital Group, a corporation organized under the laws of Georgia, either was the majority stockholder in Wood Structures, Inc. ("WSI") or through its subsidiaries, Roark Capital Partners, LP, and Roark Capital Partners Parallel, LP, controlled RC Wood Structures Holding Corp., which was the majority owner of WSI. *Id*. ¶ 11. Roark Capital Group is a parent, grandparent, or great-grandparent corporation of WSI. *Id.*

Defendant Roark Capital Partners, LP, is a corporation organized under the laws of Delaware and a wholly-owned subsidiary of Roark Capital Group, Inc. *Id*. ¶ 12. It owned 96.23% of RC Wood Structures Holding Corp., which owned 98.12% of WSI. *Id*. Defendant Roark Capital Partners Parallel, LP, is a corporation organized under the laws of Delaware and is also a wholly-owned subsidiary of Roark Capital Group, Inc. *Id*. ¶ 13. It owned 3.77% of RC Wood Structures Holding Corp., which owned 98.12% of WSI. *Id*.

Defendant RC Wood Structures Holding Corp. is a corporation organized under the laws of Delaware and a wholly-owned subsidiary of Roark Capital Partners, LP, and Roark Capital Partners Parallel, LP. *Id*. ¶ 14. It owned 98.12% of WSI. *Id*. Defendant Frank Paul, a resident of the state of Maine, was the president of and owned 1.88% of the stock of WSI. *Id*. ¶ 15.

The plaintiffs seek to represent four classes of employees of WSI. *Id*. ¶ 17.

On or about March 16, 2009, WSI announced to employees who reported to work as scheduled that day that a Chapter 11 bankruptcy which it had filed on March 3, 2009, was being converted to a liquidation under Chapter 7 of the bankruptcy code, employees were being placed on an "unpaid leave of absence for the week beginning Monday, March 16," and that future employment status would be determined by the bankruptcy trustee once the case was converted to Chapter 7. *Id*. ¶ 28.

On or about March 18, 2009, WSI issued a "permanent layoff notice" to all of its employees that said, "the Company's bankruptcy petition will be converted to a Chapter 7 on or about March 18, 2009, and it is possible that the Bankruptcy Trustee will require layoffs on March 18, 2009, or within a 14 day period beginning on this date." *Id*. ¶ 29.

On or about March 30, 2009, the United States Trustee and Orix Finance Corporation, one of WSI's creditors, filed motions to convert the Chapter 11 petition to a Chapter 7

liquidation. *Id*. ¶ 30. Neither WSI nor any of the defendants opposed this motion. *Id*. ¶ 31. On or about April 7, 2009, the bankruptcy court held a hearing and granted the motion to convert the case to a Chapter 7 liquidation. *Id*. ¶ 32. Employees of WSI were never called back to work after March 16, 2009, nor informed that their jobs were terminated. *Id*. ¶ 33.

At all relevant times Roark Capital Group, Inc. and RC Wood Structures Holding Corp. shared the same principal office address as WSI. *Id*. ¶ 34. In a press release dated September 13, 2005, Roark Capital Group, Inc. announced that it had acquired WSI. *Id*. ¶ 35. On May 7, 2009, Roark Capital Group's website identified WSI as one of its "portfolio companies." *Id*. ¶ 37.

At all relevant times, Jeffrey Keenan was president of Roark Capital Group, Inc. and president of RC Wood Structures Holding Corp., as well as an officer of WSI. *Id*. ¶ 38. At all relevant times, Lawrence DeAngelo was a member of the board of directors of WSI and a managing director of Roark Capital Group, Inc., as well as a manager for RC Wood Structures Holding Corp.. *Id*. ¶ 39. At all relevant times, Susan Herzog was a member of the board of directors of WSI and vice-president of Roark Capital Group, Inc. *Id*. ¶ 40. At all relevant times, Daniel Lonergan was vice-president and assistant secretary of WSI and an officer of Roark Wood Structures Holding Corp. (which later became RC Wood Structures Holding Corp.). *Id*. ¶ 41.

Roark Capital Group, Inc. sent John P. Jordan, a senior analyst, and Michael Lee, a senior associate, to WSI in Maine in 2008 and 2009 where they worked on WSI's business operations, including reviewing all of WSI's accounting information, list of vendors, and accounts payable. *Id*. ¶ 42. One or more of the defendants was involved in critical decisions regarding the business operations of WSI, including leading negotiations with WSI's lenders. *Id*. ¶ 43. One or more of

the defendants ultimately made the decisions to have WSI file for bankruptcy and not to oppose the motions filed by the Trustee and Orix to convert that filing to a Chapter 7 bankruptcy. *Id*.

After the individual plaintiffs were placed on indefinite unpaid leave in March 2009, they received correspondence from Roark Capital Group, Inc. and RC Wood Structures Holding Corp. regarding the continuation of their health care benefits pursuant to COBRA through CyberCore Technologies, another company owned by Roark Capital Group, Inc. *Id*. ¶ 44.

### III. Discussion

The amended complaint includes five counts. The defendants attack each in the order in which it appears in the amended complaint.

### A. Count I (Maine Severance Pay Act)

The Maine Severance Pay Act, 26 M.R.S.A. § 625-B, which is invoked by the second amended complaint, currently provides, in relevant part:

> **1. Definitions**. As used in this section, unless the context otherwise indicates, the following words shall have the following meanings.
> **A.** "Covered establishment" means any industrial or commercial facility or part thereof which employs or has employed at any time in the preceding 12-month period 100 or more persons. . . .
> **C.** "Employer" means any person who directly or indirectly owns and operates a covered establishment. For purposes of this definition, a parent corporation is considered the indirect owner and operator of any covered establishment that is directly owned and operated by its corporate subsidiary. . . .
> **G**. "Termination" means the substantial cessation of industrial or commercial operations in a covered establishment.
>
> **2. Severance pay.** Any employer who relocates or terminates a covered establishment shall be liable to his employees for severance pay at the rate of one week's pay of each year of employment by the employee in that establishment. The severance pay to eligible employees shall be in addition to any final wage payment to the employee and shall be paid within one regular pay period after the employee's last full day of work, notwithstanding any other provisions of law.

> **3. Mitigation of severance pay liability.** There is no liability under this section for severance pay to an eligible employee if:
> * * *
> **E.** A covered establishment files for protection under 11 United States Code, Chapter 11 unless the filing is later converted to a filing under 11 United States Code, Chapter 7.

26 M.R.S.A. § 625-B (2009).

At the time of the events giving rise to this action, March 16-30, 2009, the following subsections of section 625-B differed from the current version as follows:

> **1. E.** "Physical calamity" means any calamity such as fire, flood or other natural disaster, or the final order of any federal, state or local governmental agency including adjudicated bankruptcy.
> * * *
> **3. Mitigation of severance pay liability**. There is no liability under this section for severance pay to an eligible employee if:
> **A**. Relocation of termination of a covered establishment is necessitated by a physical calamity[.]

26 M.R.S.A. § 625-B (2007).

The defendants contend that, in this case, no liability attaches to any employer, as that term is defined in the statute, and which they concede they are for purposes of their motion, because WSI filed a petition for bankruptcy. Motion at 5-9. However, because the plaintiffs argue that the amended version of the statute applies to their claims, Plaintiffs' Opposition to Defendants' Motion to Dismiss Second Amended Complaint ("Opposition") (Docket No. 31) at 4-6, that issue must be addressed before considering the merits of the defendants' argument.

The plaintiffs assert that, because the WSI bankruptcy was converted from Chapter 11 to Chapter 7 on April 7, 2009, the amended statute, which took effect on March 31, 2009, should apply to their claims. *Id.* Contrary to their argument, this interpretation is not required by "the express language of the 2009 amendments." *Id.* at 5. The Maine Legislature intended that an employer's liability under the Act with respect to bankruptcy be determined by "adjudicated

6

bankruptcy" before March 31, 2009, and by a filing for bankruptcy *after* March 31, 2009, unless that bankruptcy filing was later converted from a Chapter 11 filing to a Chapter 7 filing. This does mean, as the plaintiffs lament, *id.* at 6, that the date of WSI's cessation of operations may need to be determined as well, but the additional task for the parties and the court does not provide legal justification for ignoring what is in fact clear from the language of section 625-B before and after its amendment.

The plaintiffs' last attempt to invoke the amended version of section 625-B is based on the assertion that WSI's operations ceased, for purposes of the statute, only on April 7, 2009, after the March 31, 2009, effective date of the amendment, when WSI's Chapter 11 bankruptcy was converted to a Chapter 7 liquidation. *Id.* at 7-8. In the alternative, they contend that "at this point in the litigation the exact date of the termination is a factual issue not yet established." *Id.* at 7. The latter argument is more appropriate in the context of a motion for summary judgment than it is here, where a motion to dismiss is at issue. The legal issue here is the sufficiency of what is pleaded in the current version of the complaint.

Both versions of section 625-B apply to relocation or termination of a covered establishment, and termination is defined in both as "the substantial cessation of industrial or commercial operations." The second amended complaint includes the following relevant factual allegations:

- On or about March 16, 2009, WSI placed its employees on an unpaid leave of absence for the week beginning Monday, March 16, and told them that a Chapter 11 bankruptcy it had filed on March 3, 2009, was being converted to a Chapter 7 liquidation. ¶ 28

7

- On or about March 18, 2009, WSI issued a permanent layoff notice to all of its employees. ¶ 29

- WSI employees were never called back to work after March 16, 2009. ¶ 33

- WSI owned and operated a covered establishment within the meaning of section 625-B for at least 12 months "prior to the terminations commencing on or about April 7, 2009." ¶ 49

- Since on or about April 7, 2009, there has been a substantial cessation of industrial and commercial operations at WSI. ¶¶ 52-53

The conclusory legal allegations in paragraphs 49, 52, and 53 of the second amended complaint, cast in the language of section 625-B, might be enough, standing alone, to allege a termination within the scope of the statutory definition, *but see Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (court need not accept as true legal conclusions alleged in complaint), but they do not stand alone.

The factual allegations of the complaint in paragraphs 28, 29, and 33 of the second amended complaint allow only one conclusion: WSI terminated its covered establishment, as those terms are defined in section 625-B, on either March 16, 2009, or March 18, 2009.[1] Indeed, the plaintiffs themselves, when application of section 625-B is not at issue, allege that WSI

---

[1] At oral argument, counsel for the plaintiffs emphasized the regulation issued by the Maine Department of Labor that lists five "factors to consider in determining the date of 'termination'" under section 625-B. Opposition at 8. He contended that only the fourth and fifth factors, the point at which the number of hours worked at the establishment is less than 50% of the number of hours worked for the same period one year earlier and the point at which production is less than 50% of the same measure of production for the same time period one year earlier, could be deemed to have been met given the allegations in the complaint. I disagree. With respect to the first factor, the date of the decision to close the establishment, that decision must have been made, at the latest, on March 30, 2009, when a creditor and the bankruptcy trustee filed motions to covert the bankruptcy filing to a Chapter 7 liquidation and those motions were not opposed by WSI. Complaint ¶¶ 30-31. The second amended complaint does not allege that the employees were ever informed that the establishment would be closed, the second regulatory factor, but it does allege that they were told that they were being placed on "permanent layoff." *Id.* ¶ 29. It is clear from the allegations of the complaint that the third regulatory factor, the point at which the number of employees at the establishment was less than 50% of the number of employees for the same period one year earlier, could not be later than March 16, 2009, when all employees were laid off. *Id.* ¶ 28. No need for discovery concerning these factors has been demonstrated by the plaintiffs.

"effected a 'plant closing and/or mass lay off'" "[c]ommencing on or about March 16, 2009." *Id*. ¶¶ 58-59. Those paragraphs make clear that the terms are used as defined in 29 U.S.C. § 2101, but those definitions are sufficiently close to the definition of "termination" in section 625-B[2] to make any argument that two separate events occurred at WSI untenable.

The plaintiffs also argue that the defendants cannot invoke the bankruptcy exception to either version of section 625-B because the bankruptcy did not necessitate the termination of WSI's operations. Opposition at 12. This is a reference to the statutory language exempting an employer from liability when termination "is necessitated" by a bankruptcy. 26 M.R.S.A. § 625-B(3)(A) (2007). The plaintiffs assert that "the SAC contains no allegation that WSI's bankruptcy necessitated the plant closing," Opposition at 12, nor would it be in the plaintiffs' interest to include such an allegation. The second amended complaint offers no other cause of, or reason for, the plant closing. It is a reasonable inference from the facts that are pleaded, including the proximity in time of the filing of the bankruptcy and the layoff of all of WSI's employees (15 days), that the bankruptcy did necessitate the termination of WSI's operations.

The only authority cited by the plaintiffs in support of their argument, an opinion of the Maine Superior Court deciding a motion for summary judgment, Order on Parties' Second Cross Motions for Summary Judgment on Count II of Complaint, *PACE Local 1-1069 v. Lynch Systems, Inc., et al.*, Docket No. CV-01-352, Maine Superior Court (Cumberland County), Dated November 3, 2004 (Exh. 2 to Declaration of Jeffrey Neil Young in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss Second Amended Complaint (Docket No. 32)), is readily distinguishable. In that case, the closing occurred six months before the bankruptcy

---

[2] A "plant closing" is defined as "the permanent or temporary shutdown of a single site of employment . . . if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees[.]" 29 U.S.C. § 2101(a)(2).

9

filing, rather than very soon after it, as in this case. *Id*. at 5. The bankrupt operation was a subsidiary of a subsidiary of the defendant, *id*. at 2, and the court found that

> [a]t most, the defendants have established that [the intervening subsidiary] was considering multi-entity bankruptcy in addition to other, less "calamitous," options such as the closing and liquation of [the Maine subsidiary], individually. Based on the record, the closing of the Westbrook Facility was the first step in the [intervening subsidiary's] effort to streamline its efforts and preserve its relationship with creditors. There is, however, no evidence that the closing was done in contemplation, specifically, of a later bankruptcy filing.

*Id*. at 6. In the case at hand, the second amended complaint alleges that the bankruptcy was already in existence at the time of the termination of WSI's operations. There is no reasonable inference to be drawn from these facts in favor of the plaintiffs.

Finally, the plaintiffs acknowledge that their claim under section 625-B is governed by this court's decision in *Carrier v. JPB Enterprises*, No. 01-187-P-C, 2001 WL 1646673 (D. Me. Dec. 26, 2001) (recommended decision), *adopted* Docket No. 30 (January 23, 2002), by arguing that *Carrier* was wrongly decided. Opposition at 9-12. The attorney general, in her *amicus* brief, makes the same argument. Maine Office of the Attorney General's Amicus Curiae Brief in Opposition to Defendants' Motion to Dismiss (Docket No. 19) at 4-12.

In *Carrier*, which was decided well before the statutory amendment here in dispute, the plaintiffs asserted that a corporate parent of a covered establishment cannot escape liability under section 625-B by reason of the filing of bankruptcy by the covered establishment, unless the corporate parent itself filed for bankruptcy. *Carrier*, 2001 WL 1646673 at *2. Magistrate Judge Cohen of this court rejected that argument.

> It is the language of the state statute itself that must govern, Section 625-B(3)(A) provides that there shall be no liability if termination of a covered establishment is necessitated by a physical calamity. "Covered establishment," unlike the term "employer," is not defined in section 625-B(1) to include a corporate parent. In fact, the definition of

> "employer" clearly concerns an entity separate and distinct from a "covered establishment." This distinction is crucial. In addition, the complaint does not allege that JPB is itself a "covered establishment." Accordingly, Count II of the complaint fails to state a claim on which relief may be granted.

*Id*. at *4. Nothing in the plaintiffs' argument persuades me that *Carrier*'s construction of the statutory language was "contrary to the plain language of the statute and legislative intent." Opposition at 9.[3] The same is true of the attorney general's submission.[4]

### B. Count II (WARN Act)

Count II of the second amended complaint alleges a violation of the federal Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. § 2101 *et seq*. Complaint ¶¶ 56-69. Specifically, WARN requires an employer that closes a plant to give 60 days' written advance notice of the closing to employees or their representative. 29 U.S.C. § 2102(2). WARN defines an employer as "any business enterprise that employs . . . 100 or more employees[.]" 29 U.S.C. § 2101(a)(1). There is no question that WSI was an employer under this statute, but in order to hold the defendants liable, the courts have required plaintiffs to show that a parent corporation forms a single or joint employer with its subsidiary. *E.g., Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1005-06 (9th Cir. 2004); *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 489-90 (3d Cir. 2001). The parties disagree only on the question of whether this requisite status has been pleaded sufficiently in the second amended complaint.

First, however, it may be necessary to address the plaintiffs' contention that the Supreme Court's decision in *Iqbal* should not be applied to employment cases like this one. Opposition at 13-15. In that case, the Supreme Court said that "the tenet that a court must accept as true all of

---

[3] Indeed, where, as in this case, the plain language of a statute admits of only a single construction, courts do not consider legislative intent. *United States v. Jimenez*, 507 F.3d 13, 20 (1st Cir. 2007).
[4] I recommend that the court decline the plaintiffs' request to certify this issue to the Maine Law Court, Opposition at 13, as Judge Carter did the first time this request was made. *See Carrier*, Docket Nos. 26, 30. Given the 2009 amendment of the statute, the issue presented here is highly unlikely to recur.

the allegations contained in a complaint is inapplicable to legal conclusions." *Id*. at 1949. While the subject matter of the case was claimed unconstitutional actions taken against the plaintiff while he was imprisoned, *id*. at 1942, the court's discussion and rejection of the respondent's assertion that the court's earlier ruling in *Bell Atlantic Corp v. Twombly*, 550 U.S. 544 (2007), should be confined to pleadings in an antitrust suit strongly suggests that *Iqbal* was intended to apply to all civil actions brought in federal court. *Id*. at 1953. In addition, *Iqbal* had been cited repeatedly by this court in opinions on motions to dismiss in a wide variety of cases, suggesting that this court sees that ruling as one of broad application. None of the three cases cited by the plaintiffs rejects the use of *Iqbal* in a case like this one. *See Murchison v. Astrue*, __ F.Supp.2d __, 2010 WL 46410 (D. Md. Jan. 6, 2010), at *10 n.15; *Desrouleaux v. Quest Diagnostics, Inc.*, No. 09-61672-CIV, 2009 WL 5214964 (S.D.Fla. Dec. 29, 2009), at *2; *Harper v. New York City Housing Auth.*, 673 F.Supp.2d 174, 178 (S.D.N.Y. 2009).

The plaintiffs identify the following, Opposition at 15-16, as the factual allegations in the second amended complaint that they contend are sufficient to state a claim under WARN:

> 43. Upon information and belief, one or more of the Defendants was involved in critical decisions regarding the operation of the business of Wood Structures, Inc., including leading negotiations with lenders for Wood Structures, Inc. Upon information and belief, one or more of the Defendants ultimately made the decisions to have Wood Structures, Inc. file for Chapter 11 bankruptcy and to not oppose the motions filed by the U.S. Trustee and creditor, Orix Finance Corp. on March 30, 2009, to convert that filing to a Chapter 7 bankruptcy.
>
> 44. After Plaintiffs were placed on indefinite unpaid leave in March 2009, they received correspondence from Defendant Roark Capital Group and Defendant RC Wood Structures Holding Corporation regarding the continuation of their health care benefits pursuant to COBRA. COBRA benefits were extended to former employees of Wood Structures, Inc. through CyberCore Technologies, another company owned by Roark Capital Group.

\* \* \*

> 67. At all relevant times herein, one or more of the Defendants which comprise Roark Capital exercised centralized control over Wood Structures, Inc.'s labor relations.

Complaint at 12-13, 15.

In the First Circuit, which has not addressed the single employer issue in the context of WARN, the applicable standard most likely is that set out in *Romano v. U-Haul Int'l*, 233 F.3d 655, 662 (1st Cir. 2000): "The integrated-enterprise test . . . examines four factors: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership." If this is the applicable standard,[5] the paragraphs of the second amended complaint identified by the plaintiffs do not address the first and second elements of the test, and the third is addressed only in conclusory terms. Count II fails under the *Romano* standard.

The other possible standard is that set forth in *Childress*, which is based on Department of Labor regulations promulgated under WARN:

> [S]ubsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent . . . company depending on the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

357 F.3d at 1006. This standard is even more specific than that applied in *Romano*, and the paragraphs of the second amended complaint identified by the plaintiffs fail to address the second, fourth, and fifth elements and address the third only in the most tangential sense. Again, I conclude that Count II fails under this standard.

---

[5] At oral argument, counsel for the plaintiff asserted that this court said in *Carrier* that the integrated-enterprise theory is viable for WARN claims. There is no mention of WARN or the integrated-enterprise theory in *Carrier*. 2001 WL 1646673, *passim*.

### C.  Count III (ERISA)

Count III of the second amended complaint alleges that the defendants are liable for WSI's failure to contribute to its employee health benefits plan, resulting in failure to pay medical bills incurred by WSI employees, in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.  Complaint ¶¶ 70-79.  The defendants contend that the second amended complaint does not allege sufficient facts to allow a factfinder to hold them liable for their subsidiary's ERISA obligations.  Motion at 12-14.

Specifically, the defendants assert that the plaintiffs are required to allege that the defendants had fraudulent intent with respect to the events related to this claim.  *Id*. at 13.  The plaintiffs do not identify any such allegations in their second amended complaint.  The plaintiffs respond that there is no authority supporting dismissal of an ERISA claim "based on lack of evidence of fraudulent intent prior to discovery."  Opposition at 17.

But, that is not the defendants' argument.  They base their point, appropriately in the context of a motion to dismiss, on what is present in or missing from the currently-effective complaint, not on what evidence may currently be available to the plaintiffs.  The question, therefore, is whether fraudulent intent must be pleaded when a plaintiff seeks to hold a parent corporation liable under ERISA.  The defendants cite *United Elec., Radio & Mach. Workers v. 163 Pleasant Street Corp*., 960 F.2d 1080 (1st Cir. 1992),[6] and *Crane v. Green & Freedman Baking Co*., 134 F.3d 17 (1st Cir. 1998), in support of their position.

In *163 Pleasant Street*, the First Circuit said:

> In determining when it may be appropriate to disregard corporate separateness in an ERISA-related dispute, a court using the federal [veil-

---

[6] At oral argument, counsel for the defendants referred to "the second 163 Pleasant Street case," describing the issues it addressed as "purely jurisdictional."  I assume that this is a reference to *United Elec., Radio & Mach. Workers v. 163 Pleasant Street Corp*., 987 F.2d 39 (1st Cir. 1993).  This opinion was not cited by the parties in their written submissions, and the jurisdictional issues addressed therein do not appear to have any relevance to this case.

> piercing] standard should consider (1) whether the parent and the subsidiary ignored the independence of their separate operations, (2) whether some fraudulent intent existed on the principals' part, and (3) whether a substantial injustice would be visited on the proponents of veil piercing should the court validate the corporate shield.

960 F.2d at 1093. With respect to the second listed element, the First Circuit required

> some cognizable showing that the parent corporation maintained the subsidiary to avoid its statutory responsibilities, acted in a blameworthy manner, looted the subsidiary, or so undercapitalized the subsidiary that the latter could not reasonably have been expected to meet its obligations.

*Id*.

It is true, as the plaintiffs point out, Opposition at 17, that the primary issue in *163 Pleasant Street* was the trial court's exercise of personal jurisdiction over the defendants. That fact does not deprive the quoted language of its value as guidance. Six years later, in *Crane*, the First Circuit seemed to adopt the *163 Pleasant Street* veil-piercing test in a case where ERISA was the matter at issue, reiterating that, of the three elements set forth in that case, "a finding of some fraudulent intent is a sine qua non to the remedy's availability." 134 F.3d at 22. Neither of these opinions addresses what must be pleaded in order to avoid dismissal of such a claim, however.

In *Massachusetts Carpenters Cent. Collection Agency v. Belmont Concrete Corp*., 139 F.3d 304 (1st Cir. 1998), the First Circuit discussed the "alter ego or successor liability analysis" of "claims involving employee benefit funds brought under ERISA[.]" *Id*. at 308. It rejected the *163 Pleasant Street* standard for evaluation of any issue other than jurisdiction, *id*., and directed that trial courts

> [i]n determining whether a nonsignatory employer is an alter ego of a signatory, . . . consider a variety of factors, including continuity of ownership, similarity of the two companies in relation to management, business purpose, operation, equipment, customers, supervision and anti-

> union animus – i.e., whether the alleged alter ego entity was created and maintained in order to avoid labor obligations. No single factor is controlling, and all need not be present to support a finding of alter ego status. In particular, there is no rule that wrongful motive is an essential element of a finding of alter ego status.

*Id*. (internal quotation marks and citations omitted). Most important here, the First Circuit added:

> Th[e] holding [in *163 Pleasant Street*] is not based on ERISA[.] In addition, we think the policies generally served by various corporate veil-piercing approaches address different interests than does the alter ego doctrine. We disapprove of the direct application of those veil-piercing rules for jurisdictional purposes to the very different problem we face here.

*Id*. (citation omitted). Given the First Circuit's most recent pronouncement, I conclude that pleading fraudulent intent in the plaintiffs' Count III is not required.

The defendants' assertion that the *Belmont Concrete* court "took no issue with [*Crane*'s] application of the fraudulent-intent requirement," Reply at 9, is correct, so far as it goes, but that court very clearly took issue with the application of the *163 Pleasant Street* veil-piercing standard, on which *Crane* was based, to any question other than jurisdiction. None of the remaining cases cited by the defendants as relying on *163 Pleasant Street*, *id*. – *United States v. Mountzoures*, 376 F.Supp.2d 13 (D. Mass. 2005), *U.S.P.I.R.G. v. Atlantic Salmon of Maine, LLC*, 261 F.Supp.2d 17 (D. Me. 2003), and *Sheppard v. River Valley Fitness One, L.P.*, No. CIV.00-111-M, 2002 WL 197976 (D.N.H. Jan. 24, 2002) – involved an ERISA claim. Where, as here, the First Circuit has spoken directly about the standard applicable in ERISA cases and has rejected the *163 Pleasant Street* standard for such cases, this court is bound by the First Circuit's ruling.

The defendants offer no other argument for dismissal of Count III, and their motion to dismiss should accordingly be denied as to that count.

**D. Count IV (State Law Claim)**

Count IV of the second amended complaint alleges that the defendants are liable under 26 M.R.S.A. § 626 to pay the plaintiffs four hours' pay for March 16, 2009, and their vacation pay that had accrued as of March 16, 2009, along with statutory penalties. Complaint ¶¶ 80-101. The defendants contend that they "are not the plaintiffs' employers and cannot be liable" as a matter of law. Motion at 14. The statute provides, in relevant part:

> An employee leaving employment must be paid in full within a reasonable time after demand at the office of the employer where payrolls are kept and wages are paid . . . . Whenever the terms of employment include provisions for paid vacations, vacation pay on cessation of employment has the same status as wages earned.
> \* \* \*
> For purposes of this subchapter, a reasonable time means the earlier of either the next day on which employees would regularly be paid or a day not more than 2 weeks after the day on which the demand is made.
> \* \* \*
> . . . An employer found in violation of this section is liable for the amount of unpaid wages and, in addition, the judgment rendered in favor of the employee or employees must include a reasonable rate of interest, an additional amount equal to twice the amount of those wages as liquidated damages and costs of suit, including a reasonable attorney's fee.

26 M.R.S.A. § 626.

The defendants argue that, because the statute does not define the term "employer," it may not "be interpreted to abrogate the long-standing common-law rule that parent corporations and other shareholders are not liable for a corporation's obligations." Motion at 14. In a brief presentation, they cite only *Curtis v. Lehigh Footwear, Inc.*, 516 A.2d 558 (Me. 1986), in support of their position. *Id.* That case involved 26 M.R.S.A. § 625-B, not section 626. In construing the definition of "employer" included in section 625-B, the Law Court declined to include a

corporate parent within the "undefined phrase 'indirectly owns.'" 516 A.2d at 560.[7] While this holding might have some value for construction of section 626, where the term "employer" is not defined at all, if there were no other relevant judicial interpretations of the term, relevant judicial guidance does exist.

In *Director of the Bureau of Labor Standards v. Cormier*, 527 A.2d 1297 (Me. 1987), the Law Court determined that the undefined term "employer" in 26 M.R.S.A. § 664, which requires the payment of overtime wages for hours worked in excess of 40 in a week, included as joint employers related corporate entities. *Id*. at 1298-1300. The Law Court noted that "[r]emedial statutes should be liberally construed to further the beneficent purposes for which they are enacted." *Id*. at 1300. Indeed, this court has very recently determined, in connection with a claim asserted under 26 M.R.S.A. § 626, that two corporate entities could be considered an "integrated enterprise" for purposes of liability. Recommended Decision [dated January 20, 2010] (Docket No. 60), *Anderson v. Theriault Tree Harvesting, Inc.*, Civ. No. 08-330-B-W, United States District Court for the District of Maine, at 15-18. The defendants contend that the recommended decision is "flawed," Reply at 9-10, but their argument is unpersuasive.[8]

The defendants contend for the first time in their reply memorandum that, even if they might be held liable under section 626 on some theory of joint enterprise, the second amended complaint's "allegations are insufficient to succeed on those claims, for the reasons stated in Part II.B of [the] Motion to Dismiss." *Id*. at 10. This court will not consider legal arguments raised for the first time in a reply memorandum. *In re One Bancorp. Sec. Litig.*, 134 F.R.D. 4, 10 n.5 (D. Me. 1991).

The defendants are not entitled to dismissal of Count IV.

---

[7] Section 625-B has been amended since the *Curtis* decision to clarify that corporate parents are included in the term "employer." *See* Section III(A) of this recommended decision, *supra*.
[8] The *Anderson* case was settled before any objection to the recommended decision was due to be filed.

### E.  Count V

Count V of the second amended complaint is entitled "(For Remedy of Piercing the Corporate Veil)."  Complaint at 20.  Neither a remedy nor a legal means of recovery, such as piercing the corporate veil, may stand independently as a cause of action.  While acknowledging this fact, the defendants nonetheless ask the court to dismiss or strike the count because such an action by the court "will significantly affect the future litigation."  Motion at 15.  They devote six pages of the motion to dismiss to this subject.  *Id*. at 15-20.

The plaintiffs respond in kind, offering six pages of discussion of their contention that the "motion to dismiss Plaintiffs' veil-piercing remedy should be denied."  Opposition at 20-25.  I do not see how or why the court should respond to these invitations, as Count V, as written, simply does not include a claim upon which relief may be granted.  If the plaintiffs wanted the facts alleged in Count V to be considered in connection with one or more of Counts I-IV, they should have alleged those facts in the counts to which they apply or in the general, introductory portion of their complaint.  Any "ruling" on Count V at this point, other than a *sua sponte* dismissal, could be nothing other than an advisory ruling, a practice in which this court may not engage.

### IV.  Conclusion

For the foregoing reasons, I recommend that the defendants' motion to dismiss be **GRANTED** as to Counts I and II of the second amended complaint and otherwise **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de</u> <u>novo</u> review by the district court and to appeal the district court's order.*

Dated this 27th day of May, 2010.

/s/  John H. Rich III_____
John H. Rich III
United States Magistrate Judge